E-FILED
Tuesday, 18 February, 2025 03:32:57 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS**

MARY ZUMWALT JOPHLIN, )
)
Plaintiff, ) Case No. 25-CV-____
)
v. )
)
OMOTOLA SALAMI, in his individual capacity )
as a corrections officer for the Illinois Department )
of Corrections, and RODNEY PENNINGTON, )
in his individual capacity as an Internal Affairs )
Officer for the Illinois Department of Corrections, )
)
Defendants. )

**COMPLAINT**

Now comes Plaintiff Mary Zumwalt Jophlin, by and through her legal counsel, Devlin Joseph Schoop of Laduzinsky & Associates, P.C., and complaining of Defendants Omotola Salami and Officer Rodney Pennington, in their individual capacities, as follows:

**JURISDICTION, VENUE AND ADMINISTRATIVE EXHAUSTION**

1. Plaintiff brings this action pursuant to 42 U.S.C. §1983 to redress the deprivation under color of state law of her rights as secured by the United States Constitution.

2. The federal subject matter jurisdiction of this Court is invoked pursuant to the Civil Rights Act, 42 U.S.C. §1983, and the First and Eighth Amendments to the United States Constitution. This Court accordingly has jurisdiction over this suit pursuant to 28 U.S.C. §1331 and §1343(a).

3. Venue is proper in the Central District of Illinois, Peoria Division, under 28 U.S.C. §§93(b) and 1391(b)(1) and (2). On information and belief, Defendants reside in this judicial district, and the events giving rise to the claims asserted herein all occurred within this district.

4. Plaintiff Mary Zumwalt Jophlin has complied with the prerequisites of the Prison Litigation Reform Act (PLRA). She fully exhausted the IDOC grievance process governing PREA allegations. She initiated an grievance on September 30, 2024. That grievance was denied at Logan and she advanced her grievance to the Administrative Review Board, which denied her grievance on January 17, 2025. But that January 17, 2025 denial was not actually received by Plaintiff until February 11, 2025 due to an apparent, as-of-yet unexplained, delay in Plaintiff's IDOC mail.

**PARTIES**

5. Plaintiff Mary Zumwalt Jophlin is currently incarcerated in the Illinois Department of Corrections (IDOC), housed at Logan Correctional Center.

6. At all times relevant to the events at issue in this case, Defendant Omotola Salami was an employee of the IDOC working as a correctional officer at Logan. Defendant Salami is being sued in his individual capacity. At all times relevant to the events at issue in this case, Defendant Salami was acting under color of state law and within the scope of his employment.

7. At all times relevant to the events at issue in this case, Defendant Omotola Salami had a legal duty to comply with all requirements of the Prison Rape Elimination Act of 2003 (PREA).

8. At all times relevant to the events at issue in this case, Defendant Rodney Pennington was an employee of the IDOC working as a corrections officer charged with performing "intelligence" duties for IDOC's Internal Affairs Division at Logan Correctional Center. Defendant Pennington is being sued in his individual capacity. At all times relevant to the events at issue in this case, Defendant Rodney Pennington had a legal duty to comply with all requirements of the PREA.

9. At all times relevant to the events at issue in this case, Defendant Pennington was acting under color of state law and within the scope of his employment. Defendant Pennington is being sued in his individual capacity.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

**Mary Zumwalt Jophlin is yet another in a long line of women sexually assaulted at the "Rape Trap" more commonly known as Logan Correctional Center. Her sexual assault was the result of a Prison Rape Culture Promoted and Perpetuated by a Code of Silence Condoned by IDOC Executive Staff and Correctional Officers.**

10. At all times relevant to the events at issue in this case, IDOC knew that Logan Correctional Center was and is an inherently dangerous place because it must frequently make mandatory reports of death and sexual assaults occurring within Logan Correctional Center, as required by:

(a) the Reporting of Deaths in Custody Act, 730 ILCS 201;

(b) the federal Death in Custody Reporting Act of 2013; and

(c) the federal Prison Rape Elimination Act of 2003 (PREA).

11. But there was another reason why the entire corrections staff at Logan Correctional Center knew that Logan **was particularly dangerous for most of the women incarcerated at Logan**.

12. By January 2023, anybody paying attention knew that Logan Correctional was a hotbed of hypersexualized activity where corrections officers and/or other inmates subjected female inmates to sexual harassment, if not, outright sexual assault on a nearly daily basis.

13. Since 2023, two (2) federal juries in the Central District of Illinois have rendered staggering multi-million-dollar verdicts after concluding that officials at Logan Correctional Center would rather hide the problem and allow women to be sexually assaulted and harassed by

correctional officers instead of holding sexual predators – particularly prison correctional officers – accountable for their outrageous misconduct.

14. Women prisoners at Logan Correctional Center are being subjected to a systemic custom and practice of sexual harassment and sexual violence fueled by a "Code of Silence" being perpetuated by the prison officials and corrections officers at Logan Correctional Center. And nobody at IDOC cares, despite how it is costing Illinois taxpayers dearly in jury verdicts and court judgments.

15. The law is simple: those who commit crimes are incarcerated, in part, to pay their proverbial debts to society. But the ledger for measuring the repayment of that debt has **never** required prisoners to be subjected to sexual harassment or sexual violence as part of their sentence. But for years, that is precisely what has been allowed to happen to female prisoners housed at Logan Correctional Center.

16. The mentality of IDOC is that the law is an inconvenience to be ignored, and that rape is an inevitable "fact of life" in prison. It is the institutional mindset of IDOC that if somebody does not want to be raped, then they should not go to prison.

17. If you are the sort of person who enjoys raping other human beings, then IDOC (generally), and Logan Correctional Center (particularly) is an ideal place for you to work. That is because rarely has a Director – LaToya Ja'Nae Hughes, Rob Jeffreys, Roger Baldwin, Salvador Godinez – or a warden at individual corrections centers sustained a rape allegation lodged by a prisoner against a corrections officer. And there have been plenty of credible allegations lodged over the years.

18. Instead, the *modus operandi* at IDOC is to deny, obfuscate and ignore allegations of rape lodged by prisoners. That is especially true if the allegation is made against an IDOC

employee. It is a "catch-me-if-you-can" mentality where IDOC drags out litigation, and keeps its fingers crossed that a jury will not be believe a prisoner who claims they have been raped, or, worse yet, that a jury will not care.

19. Even where, as here, the allegations are being made *repeatedly* against the same perpetrator. In this instance, Defendant Omotola Salami.

20. IDOC has been acutely aware that Omotola Salami is a serial rapist and has done nothing to stop him.

21. Defendant Omotola Salami is a serial rapist, who on information and belief, has been the subject of multiple investigations conducted by the purported "intelligence" officers of IDOC's Internal Affairs Division, including "investigations" conducted by IDOC "intelligence" Lt. Chad McGinnis.

22. And this time, the IDOC "Code of Silence" has seriously injured yet another woman: Mary Zumwalt Jophlin.

23. At all times relevant to this cause of action, each and every one of the Defendants were aware that Mary was a vulnerable prisoner likely to be the victim of sexual violence while housed at Logan.

**Omotola Salami's Abuse of Power to Coerce Mary Into Non-Consensual Sexual Relations.**

24. As a matter of law, an incarcerated prisoner cannot consent to sexual contact with a correction's officer, as set forth by the PREA.

25. According to federal law, all sexual relations between staff and inmates are considered abuse *even if a sexual act would have been considered consensual if it occurred outside of a prison*. 18 U.S.C. §2243(c).

26. At all times relevant to the events at issue in this case, **consent** is defined as a freely given agreement to the act of sexual penetration or sexual conduct in question. Lack of verbal or physical resistance or submission by the victim resulting from the use of force or threat or force by the accused shall not constitute consent. 720 ILCS 5/11-1.70.

27. At all times relevant to the events at issue in this case, **sexual conduct** is defined as any knowing touching or fondling by the victim or the accused, either directly or indirectly or through clothing, of the sex organs, anus, or breast of the victim or the accused, or any part of the body of a child under 13 years of age, or any transfer or transmission of semen by the accused upon any part of the clothed or unclothed body of the victim, for the purpose of sexual gratification or arousal of the victim or the accused. 720 ILCS 5/11-0.1.

28. At all times relevant to the events at issue in this case, a person commits the crime of **criminal sexual assault** if that person commits an act of sexual penetration and knows that the victim is unable to give knowing consent. 720 ILCS 5/11-1.20.

29. At all times relevant to the events at issue in this case, a person commits **stalking** when he or she knowingly engages in conduct directed at a specific person, and he or she knows or should know that this course of conduct would cause a reasonable person to fear for his or her safety or the safety of a third person . . . or suffer other emotional distress . . . or when he or she, knowingly and without legal justification, on at least two separate occasions follows another person or places the person under surveillance or any combination thereof and at any time transmits a threat of immediate or future bodily harm, sexual assault, confinement or restraint and the threat is directed towards that person or a family member of that person, or places that person in reasonable apprehension of immediate or future bodily harm, sexual assault, confinement or restraint to or of that person . . . . 720 ILCS 5/12-7.3.

**Serial Rapist Corrections Officer Omotola Salami Twice Raped Mary Zumwalt Jophlin.**

30. In January 2020, Defendant Omotola Salami attacked Mary, forcing Mary to have non-consensual sex.

31. IDOC was aware of the attack but did nothing.

32. Specifically, Defendant Rodney Pennington became aware of the attack while investigating an unrelated allegation that Mary was being harassed by a former cellmate.

33. During Pennington's investigation, Pennington learned from witnesses about a rumor that Defendant Omotola Salami had raped Mary.

34. When Pennington interviewed Mary, she admitted that Salami had raped her.

35. But Pennington did not report Salami's conduct to IDOC or the local authorities and actively discouraged Mary from submitting an emergency grievance to IDOC pursuant to PREA regulations. Pennington discouraged Mary from doing so because of his own personal conflict of interest.

36. Defendant Pennington and Mary had a prior sexual relationship, in violation of federal and state law, and IDOC regulations. Defendant Pennington feared that if Mary reported Salami's sexual assault, then there was a risk that Pennginton's sexual relationship with Mary would be revealed during a subsequent PREA investigation, exposing Pennington to discharge from his employment and/or possible criminal prosecution for raping a prisoner, or possibly both.

37. Pennington told Mary to remain silent about how Salami raped her, implying that if she failed to remain silent that she could be subjected to retaliation.

38. Due to the implicit threats from Pennington, Mary remained silent about Defendant Salami's January 2020 rape.

39. But Pennington's selfishness and Mary's compelled acquiescence to remain silent came at a price: Salami raped Mary again, in February 2023.

40. In February 2023, Defendant Omotola Salami, attacked Mary, forcing Mary to have non-consensual sex.

41. After raping Mary, Salami threatened Mary with harm if Mary reported Salami's attack to the authorities.

42. Scared for her life, Mary kept silent.

43. That prisoners cannot consent to sexual relations with corrections officer is the cornerstone of IDOC's policy of "zero tolerance for sexual abuse or sexual harassment of any person or sexual relationships between staff and offenders."

44. The rationale behind this "zero tolerance" policy is simple: corrections staff and prisoners are in inherently unequal positions; the power imbalance means that prisoners do not have the same ability to consent to sexual relationships, particularly because corrections officers can take advantage of vulnerable prisoners.

45. For the incarcerated, life in prison is strictly regimented and there are rules -- Administrative or Institutional Directives -- governing nearly every aspect of a prisoner's life from when they eat or sleep, what they can wear and how they maintain their living quarters.

46. Violation of these rules can result in the issuance of a "disciplinary ticket" which if sustained can result in the *de facto* extension of the prisoner's sentence by delaying their eligibility to be released on parole.

47. Another reality of being a prisoner: as a convicted felon, nobody in authority believes your word over the word of a corrections officer. If accused by a corrections officer of violating a prison rule, prisoners are routinely disbelieved because, as convicted felons, they are

presumed to be liars. The end result gives corrections officers incredible power to manipulate prisoners and compel prisoners to acquiesce to the will of corrections officers.

48. Threatening to initiate a false disciplinary ticket against Mary and/or threatening to have her attacked by other inmates, Defendant Omotola Salami coerced Mary into remaining silent about the rape. Mary was absolutely convinced that Salami would make good on his threat and have Mary and/or her family murdered. Moreover, Defendant Pennington likewise implied that he would retaliate against Mary if she reported Salami's rape, fearing that any PREA investigation would reveal Pennington's inappropriate sexual relationship with Mary, exposing him to serious consequences.

49. But then it happened: Salami tipped his hand, showing how weak and scared he truly was. One day during a family visit, Salami observed Mary's mother and sister leaving Logan after concluding a visit with Mary.

50. Defendant Salami followed Mary's sister and mother as they left the facility, walking so closely behind them that he nearly walked into them both. When Mary's sister stopped to look over her shoulder, she and her mother could see Salami standing behind them. Salami, in an angry tone of voice uttered words to the effect, "you do not know who you are messing with." Salami, visibly distressed, then stormed off.

51. After that encounter, Mary's family suspected that there was something improper going on between Mary and Defendant Salami. During a subsequent visit, Mary confided in her sister that Defendant Salami raped Mary.

52. But Mary also confided another detail which ultimately gave Mary the courage to come forward and report Salami to IDOC: Mary has DNA evidence belonging to Defendant Salami that will confirm that Defendant Salami had sexual relations with Mary.

**Lt. Chad McGinnis' "Investigation" of Mary's PREA Complaint.**

53. After Mary reported Defendant Salami's rape, the subsequent PREA investigation was conducted by Lt. Chad McGinnis. It was hardly a model of investigatory best practices.

54. McGinnis met Mary alone in his office.

55. McGinnis' interview of Mary was not recorded, either in video or audio format.

56. There was no witness present to act as a "prover" as to what McGinnis asked Mary or how she answered those questions.

57. McGinnis began asking Mary a series of leading questions, in a hostile tone of voice manifesting disbelief at everything Mary told McGinnis.

58. McGinnis asked Mary to describe any unique physical characteristics about Salami, including the size and length of his penis and whether there was anything special about Salami's pubic hair.

59. When Mary answered McGinnis' questions, McGinnis snapped at Mary in a taunting tone of voice, telling her "I don't believe you" and "what took so long for you to report this?"

60. It was readily apparent that McGinnis was unwilling to take Mary's allegations seriously, and that McGinnis, like Pennington earlier, would only actively discourage Mary from pursuing her grievance against Salami.

61. Mary's grievance was slow-walked by IDOC for several months until IDOC Acting Director LaToya Ja'Nae Hughes denied Mary's grievance in "rubber stamp" fashion on or about January 17, 2025. But Mary did not receive the notice of the denial until February 11, 2025 when it as finally received in delayed U.S. mail.

**The Injury Inflicted Upon Mary by the Defendants.**

62. As a direct and proximate result, Plaintiff Mary Zumwalt Jophlin had her right to bodily integrity taken from her by Defendant Omotola Salami.

63. As a direct and proximate result, Plaintiff Mary Zumwalt Jophlin had her dignity as a human being taken away from her by Defendant Omotola Salami.

64. As a direct and proximate result, Plaintiff Mary Zumwalt Jophlin has suffered extreme emotional distress inflicted upon her by Defendants Omotola Salami and Rodney Pennington.

65. As a direct and proximate result, Plaintiff Zumwalt Jophlin has suffered trauma inflicted upon her by Defendant Omotola Salami causing Mary to suffer from disturbing flashbacks, avoidance, and constant feelings of fear for her personal safety and the safety of her family. Mary suffers from severe depression, anxiety, and stress. Mary's symptoms include regular nightmares about Defendant Salami.

**CAUSES OF ACTION**

**COUNT I**
**42 U.S.C. §1983 – Excessive Force (Eighth Amendment)**
**(Plaintiff Mary Zumwalt Jophlin against Defendant Omotola Salami)**

66. Each of the foregoing paragraphs are incorporated as if restated fully herein.

67. In the manner described more fully above, Defendant Omotola Salami used force and the threat of force against Mary to coerce her into having sexual relations. That force, which included non-consensual sex, was objectively unreasonable, meant to degrade and humiliate Mary and served no penological justification.

68. In using force against Mary, Defendant Omotola Salami used extreme or excessive cruelty toward her for the purpose of inflicting harm, including degradation and humiliation of

Mary. The actions by Defendant Salami were not made in a good faith effort to maintain or restore security or discipline.

69. Alternatively, Defendant Omotola Salami knew that using force in the form of non-consensual sex with Mary presented a risk of harm to Plaintiff, but recklessly disregarded that risk and Plaintiff's emotional and physical safety by failing to take reasonable measures to minimize the risk of harm.

70. As a direct and proximate cause of Defendant Omotola Salami's misconduct, Mary's rights were violated and she has experienced injuries, including physical injuries and emotional distress.

WHEREFORE, Plaintiff Zumwalt Jophlin demands and prays for judgment against Defendant Omotola Salami, for compensatory damages in an amount to be determined by a jury, including prejudgment and post-judgment interest, costs, reasonable attorneys' fees and such other and additional relief that this Court deems equitable and just.

**COUNT II**
**42 U.S.C. §1983 – Failure to Protect (Eighth Amendment)**
**(Plaintiff Mary Zumwalt Jophlin against Defendant Rodney Pennington)**

71. Each of the foregoing paragraphs are incorporated as if restated fully herein.

72. In the manner described more fully above, Defendant's conduct toward Mary violated her right to be free from cruel and unusual punishment. Sexual assault and harassment serve no penological justification.

73. During the constitutional violations described above, Defendant Rodney Pennington knew or substantially suspected that Defendant Omotola Salami was subjecting Plaintiff and other female prisoners housed at Logan Correctional Center to sexual exploitation, sexual abuse, sexual harassment of an unwanted nature, and often procured sexual gratification

with female prisoners through the threats and intimidation with the badge of his authority as a corrections officer for the Illinois Department of Corrections.

74. Despite this knowledge, Defendant Rodney Pennington affirmatively discouraged Mary from reporting Defendant Salami's sexual assault and made implicit threats that Mary would be subjected to retaliation if she reported Salami's misconduct.

75. Defendant Rodney Pennington knew that this course of conduct was in violation of IDOC policy, federal law (PREA) and Mary's constitutional rights to be free from cruel and unusual punishment," but stood by without intervening to prevent Defendant Omotola Salami from subjecting Mary from further unwanted sexual exploitation, abuse and harassment of an unwanted nature, which continued to happen after Mary admitted to Pennington that Salami had raped her.

76. The misconduct alleged in this Count was deliberately indifferent and pursued without penological justification and was contrary to controlling state and federal penological standards set forth in the Illinois Administrative Code, the Prison Rape Elimination Act of 2003, and the United States Constitution.

WHEREFORE, Plaintiff Mary Zumwalt Jophlin, demands and prays for judgment against Defendant Rodney Pennington for compensatory damages in an amount to be determined by a jury, including prejudgment and post-judgment interest, costs, reasonable attorneys' fees and such other and additional relief that this Court deems equitable and just.

**JURY DEMAND**

Plaintiff Mary Zumwalt Jophlin hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues raised in this Complaint, which are triable by right of a jury.

PLAINTIFF MARY ZUMWALT JOPHLIN

By: /s/ *Devlin Joseph Schoop*
Counsel for Plaintiff

Devlin Joseph Schoop, Esq.
Laduzinsky & Associates, P.C.
216 South Jefferson Street, Suite 301
Chicago, IL 60661-5743
Tel.: (312) 424-0700
dschoop@laduzinsky.com